IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ARTHUR POPE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 15-422 |
| | ) | |
| BAYER MATERIALSCIENCE LLC, | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

Plaintiff, Arthur Pope, brings this action against his former employer, Defendant Bayer

MaterialScience LLC ("Bayer"), alleging that Bayer violated the Age Discrimination in

Employment Act, 29 U.S.C. §§ 621-34 (ADEA), when it terminated him from his position as a

Global Purchasing Manager on July 22, 2013 at the age of 51.  Plaintiff contends that the

proffered reason for his discharge—an investigation leading to the conclusion that he was

frequently absent from the workplace—was a pretext for unlawful age discrimination.

Presently pending before the Court is a motion for summary judgment, filed by

Defendant, seeking dismissal of Plaintiff's age discrimination claim.  For the reasons that follow,

the motion will be granted.

Facts

Bayer's predecessor, Mobay Chemical Corporation, hired Plaintiff in 1989 to work in its

Pittsburgh office.  He was discharged on July 22, 2013. (Pope Dep. 7.)[1]  For the 13 years prior to

his discharge, Pope worked in the Procurement Department (referred to as "PROTRA") as a

Global Purchasing Manager. (Pope Dep. 7, 11.) Plaintiff had three supervisors at the time of his

discharge on July 22, 2013: his Administrative Supervisor, Demetri Zervoudis (Pope Dep. 12;

_____

[1] Def.'s App. (ECF No. 37) Tab A.

Zervoudis Dep. 15[2]); his Reporting Supervisor, Patrick Sion (Pope Dep. 13; Sion Decl. ¶¶ 2, 4[3]);

and his Functional Supervisor, Hans Uwe-Scholz (Pope Dep. 13-14). Uwe-Scholz reported to

Patrick Sion. Immediately prior to Zervoudis, Michael Friede served as Plaintiff's

Administrative Supervisor. (Friede Dep. 8-10[4]; Pope Dep. 12; Zervoudis Dep. 8-9.) Friede

officially relocated to Germany on March 1, 2013 to take a different position with Bayer, thereby

relinquishing his role as Plaintiff's Administrative Supervisor to Zervoudis. In addition, he was

traveling and in transition to his new assignment, so he was not in his office much in January and

February 2013. (Pope Dep. 12; Friede Dep. 8-10, 71; Zervoudis Dep. 8-9.)

<u>The Anonymous Letter</u>

In June 2013, Bayer's compliance department received an anonymous letter stating that

there was an "attendance problem" with Pope. The anonymous letter stated in part:

> I find it troubling to write this, but you have an attendance problem with a BMS
> Procurement Manager. Most appreciate and do not abuse Bayer's flexible work
> schedule, however this person does. When he is in the office it is usually not
> before 10 and is gone before 4. I have observed this behavior for years, and it is
> affecting the morale of the department and causing others to start to behave in the
> same way.

(Badamo Dep. Ex. P-3.)[5] The anonymous letter specified it was referring to Pope and included a

"recent example" of Pope's alleged work attendance. The letter explained that Pope was often

absent from work, and that when he did come to work, he would often arrive late and leave early.

The letter suggested that a review of the "badge usage" records would confirm the

complaint. (Badamo Dep. 9 & Ex. P-3.) When employees enter the building in which Plaintiff

worked, they are required to swipe a badge into a reader, and a record is made of their entries.

_____

[2] ECF No. 37 Tab B.
[3] ECF No. 37 Tab C.
[4] ECF No. 37 Tab D.
[5] ECF No. 37 Tab E.

(Pope Dep. 77-78, & Ex. D-5; Badamo Dep. 22-23.) Plaintiff points out that employees are not required to use their badge when exiting the building (and employees cannot do so). (Pope Decl. ¶ 15.)[6] There was no policy requiring employees to use badges upon entry to the building in which Plaintiff worked (Building 14) for purposes of generating a record of entries. (Pope Dep. 62-63; Skeba Dep. 11[7]; Yeh Dep. 29.[8]) As a security measure, the doors required use of a badge to enter; however, employees could access the building at the same time as another employee who had used his or her badge, in which case there would be no entry reflected on the badging record. (Pope Dep. 56; Skeba Dep. 11-12.) Additionally, employees could be buzzed in by security if they did not have their badge. (Pope Dep. 62; Skeba Dep. 11, 15.)

The Investigation

Jeffrey Badamo, Bayer's HR Business Partner assigned to the PROTRA Department, was charged with investigating the allegations in the anonymous letter. (Badamo Dep. 17, 36, 220; Zervoudis Dep. 39-40.) Badamo stated that he did not know who wrote the letter and did not begin his investigation with any assumptions regarding the truth of its contents. (Badamo Dep. 16, 92.) Plaintiff contends that Badamo's conduct in the investigation belies this assertion, as described below. Bayer indicates that Badamo was the only investigator and fact gatherer in the investigation into the allegations of the anonymous letter. (30(b)(6) Dep. 35-37.)[9]

Badamo restricted the timeframe of his investigation to 2013. (Badamo Dep. 31). He decided to look at the situation "from only a current year perspective as a transition from one

---

[6] Pl.'s App. (ECF No. 47) Tab W.
[7] Pl.'s Supp. App. (ECF No. 57) Tab X.
[8] ECF No. 47 Tab L.
[9] Badamo testified on behalf of Bayer as its corporate designee pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure. See Badamo Dep. 5; Badamo Dep. Ex. D-1 (ECF No. 47 Tab V). Badamo testified in his individual capacity and on behalf of Bayer in the same deposition. Plaintiff identifies answers given on behalf of the corporation as "30(b)(6) Dep."

local manager to the next." (Badamo Dep. 32.)  Badamo's investigation began on or around June 19, 2013 when he notified Sion of Bayer's receipt of the anonymous letter. (Badamo Dep. Ex. P-7 (Bayer-00675-00676)).  Badamo conducted an investigation of Plaintiff's attendance, beginning with January 2013, to determine whether the anonymous letter had any merit, including whether Plaintiff was violating any workplace policies or expectations. (Badamo Dep. 11-12, 22, 27, 31-32.)

Plaintiff responds that Badamo testified that he did not "really go[] back and us[e] the [anonymous] letter as any sort of document that I was trying to tie [the investigation] to." (Badamo Dep. 31-32.) For instance, Badamo did not seek to match the "recent example" of attendance listed in the anonymous letter with the badging activity report he ran. (Badamo Dep. 24.)

Badamo examined the building entry records from January through June 12, 2013 to determine the dates when Plaintiff had swiped in at some time and the dates when he had not swiped in at all.  This information was recorded on a calendar where days with no swipe activity were colored red, and days with some swipe activity, indicating presence at the work site, were colored green. (Badamo Dep. 50-51 & Ex. P-6.)  Badamo's study of the building entry records showed that of 116 work days, there was no evidence of Pope's having been in the building on 70 of those days. (Ex. P-6 at 1.)  Plaintiff responds that Badamo admitted that the badging activity report did not paint a reliable picture in and of itself of his presence in the building in which he worked. (30(b)(6) Dep. 220.)

On June 20, 2013, Badamo explained to Sion via email that he had pulled "data (PC use and badge swipes)" and that he wanted to "discuss if [Sion had] any problems with [Pope's] accessibility and work performance." (Badamo Dep. 69 & Ex. P-7 (Bayer-00675)).  With his

email, Badamo provided a calendar he had prepared based upon the badging activity report. (June 20, 2013 Email Badamo to Sion (Bayer-00677-679).[10] The calendar reflected the 70 days where no badging activity was shown.

In response, Sion cautioned that he was "not sure how reliable the badge swipe is since you can get in or out with somebody else" and informed Badamo that "[w]e (PROTRA) do support home office days on an exception base and but (sic) have not fixed any rules – nor do we have any obligation to be connected always on lync." (Badamo Dep. Ex. P-7 (Bayer-00675)).[11] Badamo did not recall if Sion was shown the anonymous letter, but he shared its contents with Sion. (Badamo Dep. 19; Sion Dep. 45.[12])

On June 21, 2013, Badamo informed Zervoudis of the situation. (Zervoudis Dep. 18; Dep. Ex. P-8 (Bayer-00673).)[13] Zervoudis' initial response stated, "Was there an issue before this? Was Friede aware of this?" (Dep. Ex. P-8) (Bayer-00672)). Zervoudis wanted to know if Friede knew of an issue "like this before." Zervoudis believed "Friede should know if there was an issue." (Zervoudis Dep. 19).

Badamo replied to Zervoudis by email the same day. Badamo wrote, "I don't know or recall if there were prior attendance issues . . . I went [to] ask Glenn [McEvoy, another PROTRA manager] (not using any reference to this situation with [Pope], if there were any ProTra guidelines for working remotely (i.e. home, etc.). He said no." (Dep. Ex. P-8 (Bayer-00672)). McEvoy also informed Badamo that "[Pope] needed them" (guidelines for working remotely). (Id.) (See Badamo Dep. 205) (explaining that Badamo interpreted McEvoy's gesture to mean

---

[10] ECF No. 47 Tab Q.
[11] Lync is the interoffice instant messaging service used by Bayer.
[12] Def.'s Supp. App. (ECF No. 53) Ex. 1.
[13] ECF No. 57 Tab Z.

that the "Packaging function" needed guidelines, i.e., "both [Pope] and [his co-worker] Eric [Yeh]").

Zervoudis responded to Badamo's email later the same day. Zervoudis stated, "It is clear that [Sion] has the final word on this topic…..If [Pope] does his job, I really do not see an issue …unless we have specific rules." (Dep. Ex. P-8 (Bayer-00672)).  Badamo agreed with Zervoudis' sentiment that there was no issue if Pope did his job unless there were specific rules. (Badamo Dep. 97 & Ex. P-7 (Bayer-00675); Badamo Dep. 69) (indicating a desire to discuss whether there were any problems with Pope's "work performance")).  Sion agrees he had the final say in the discipline of Pope. (Sion Dep. 66.)

According to Zervoudis, Sion would be in the best position to comment on Pope's job performance and Bayer's expectations of him (Zervoudis Dep. 36, 43). Zervoudis' job in the process was to assure that Bayer was being fair and clear on the way it treats employees and to "make sure that whatever the decision is, it is clear and well communicated with all the people involved and by being fair to the company and to  Pope." (Zervoudis Dep. 31, 44.)

Zervoudis was concerned about the fact that the anonymous letter claimed that the problem behavior had been "observed . . . for years" and that it purported to be "affecting the morale of the department and causing others to start to behave in the same way." Zervoudis instructed Human Resources to investigate these claims and make sure the department's policies were clear. (Zervoudis Dep. 62.)

Zervoudis could not have known if there was a morale problem in the department because he did not know the people in the department.  Zervoudis believed Friede would have known if there was a morale problem in the department. (Zervoudis Dep. 63.)  In carrying out his

function in the process, Zervoudis directed Badamo to "please work together with [Pope] to provide you all the information before we start jumping to conclusions." (Zervoudis Dep. 51-52.)

Badamo Meets with Pope

Badamo met with Pope for the first time on June 26, 2013 (Pope Decl. ¶ 27; Badamo Dep. Ex. P-4 (Bayer-00524)). In the meeting, Badamo explained to Pope that Bayer had received an anonymous letter concerning his attendance. Plaintiff states that Badamo flashed the color-coded calendar to him for approximately five seconds before proceeding to request that he prove to Badamo what he had been doing for every day of calendar year 2013. (Pope Dep. 53.)

Defendant denies that Badamo made the statements attributed to him by Pope. (Badamo Dep. 42-44.) It contends that Plaintiff was directed to account for his days off work. (Pope Dep. 52-54 & Ex. D-2.) Plaintiff responds that Badamo directed him to account for all work days, not just those days he was off work. (Badamo Dep. Ex. P-4 (Bayer-00522) (Badamo stating, "Please provide any information you on days that are not associated with vacation logged in HR//online or the two business trips . . . supported by T&E submitted."). This directive was echoed by Sion, who indicated that he informed Pope "it is important and necessary for him to prove the days he has been working, on sick leave and traveling." (Badamo Dep. Ex. P-11 (Bayer-00509)). Furthermore, Badamo refused to provide Plaintiff with the days in question based upon his review of badging activity.

Later on June 26, 2013, Badamo followed up the meeting with an email to Pope, again requesting information on attendance for 2013. In the email, Badamo also indicated that the "investigation is not related to compliance issues with T&E or any other company policy." (Badamo Dep. Ex. P-4 (Bayer-00524)). Zervoudis understood "that it was a conversation, and it

was also clear from my previous emails please work together with [Pope] to provide you all the information before we start jumping to any conclusions."  (Zervoudis Dep. 51-52.)

In response, Pope requested the specific days in question to "make it easier to cross reference," and he informed Badamo that "on a couple of occasions my 2yr old grandson hid my badge (he lives with me)." (Badamo Dep. Ex. P-4 at Bayer-00523).  The next day, Badamo responded: "Art, the process doesn't work that way. Please provide any information that you [have] on days that are not associated with vacation logged in HR//online or the two business trips . . . supported by T&E submitted." (Id. at Bayer-00522)).

On June 27, 2013, Pope provided what he believed to be his first pass attempt at responding to Badamo's inquiry. (Pope Dep. 53-54; Pope Decl. ¶¶ 33-37.)  Without the specific days in question and considering the limited amount of time he was given to respond, Pope determined that the most efficient and effective means to comply with Badamo's request was to search his emails to identify days that he was out of the office for any reason, including sick days, personal days, vacation days, work from home days, and off-site supplier meeting days. Pope's email review included a review of his emails to those individuals he was most likely to make aware of his whereabouts: Carol Mavilla, Margaret Zyroll, and Eric Yeh. (Pope Decl. ¶¶ 33-34.)  In his email response, Pope outlined days he had been out of the office due to illness, vacation, personal reasons, working from home, and off-site supplier meetings. (Badamo Dep. Ex. P-4 (Bayer-00522)).  Pope stated that the breakdown of his time off was 5 days for illness; 8 days for vacation; 1 personal day; 10 days when he was working from home; and 3 days at off-site supplier meetings. (Pope Dep. 63-66 & Ex. D-2.)  After receiving Pope's response, Badamo emailed Zervoudis suggesting "at the very minimum [Pope] has lost his privilege to work from

home." (Dep. Ex. P-10 (Bayer-00675)).[14] Badamo also stated in his email "[t]he number of vacation days not approved or entered is stealing . . . [i]f we wouldn't have challenged, would he have ever entered?" (Id.)

Sion had a teleconference with Pope on the same day and sent an email to Zervoudis and Badamo recapping that conference. In his email, Sion stated:

> Told him that it is important and necessary for him to prove the days he has been working, on sick leave and traveling (corresponding document or by meeting minutes /telco s/mails..)
> . . .
> [Pope] mentioned that [he] has worked a certain number (around 10) days from home. Explained that in Bayer we do not have a guideline regarding the handling and max number of days acceptable. But in any case we request a[n] information mail (Jeff – this may have to be readdressed, since I know that also other colleagues are working from time to time at home).
> . . .
> [Pope] should communicate home office days, annual leave, sick leave…. to his RAF supervisor.

(Dep. Ex. P-25 (Bayer-00527)).[15] In response to that email, Zervoudis sent a reply email. In his email, Zervoudis described "the situation at hand" as:

> (1) If [Pope] was on an improvement plan, related to this topic, what was the exact language (documentation) that was communicated to him in terms of expectations?
>
> (2) If point 1 is clear, then [Pope] is in violation of management expectations and company rules >>> termination is the logical option.
>
> (3) If point 1 is not clear,
>     a. is management willing to create a 3rd severe improvement plan with ZERO tolerance?
>         i. Reporting to another PROTRA member of Leadership team that is mostly in Pgh
>         ii. Assure that he maintain a clear schedule in his computer
>         iii. He reports to work on specified hours and seeks approval for requests to work from home

---

[14] ECF No. 57 Tab BB.
[15] ECF No. 57 Tab AA.

> b. Is management willing to proceed with a termination, given the fact that [Pope] does his job?
>> i. It would be impossible to excuse and reconcile the huge number of absence days or days in question
>> ii. LIFE leadership is in question
>> iii. [Pope] does not have an agreement from his management to work flexible hours or from home.

(Dep. Ex. P-25 (Bayer-00526)). Sion agreed with Zervoudis' assessment of the situation as expressed in his June 27, 2013 email (Dep. Ex. P-25). (Sion Dep. 83.)

Bayer employees were responsible to enter on a computer system called HR Direct whenever they missed work due to personal days, vacation or sickness, so the Company could keep track of their usage of paid days off. These days were to be entered before or in close proximity to the absence. (Pope Dep. 66-68.) Plaintiff had entered his vacation, sick days and personal days on the HR Direct system throughout the year 2012 in close proximity to the date of the absences, in compliance with Bayer's policy. (Pope Dep. 72-73 & Ex. D-3.) In 2013, by contrast to 2012, as of the date Badamo confronted Plaintiff with the fact that his attendance was being investigated, Plaintiff had entered only one week of vacation that he took in March. (Pope Dep. 73-74 & Ex. D-3.)

Plaintiff notes that Bayer has not pointed to any written policies requiring employees to enter their absences in the HR Direct system within any set period of time before or after the absences. Furthermore, Carol Mavilla—the administrative assistant for the PROTRA department—testified "there was no set time [when employees had to enter absences into the computer system], but HR would catch up with you and say you were on vacation for X amount of days, you don't have it in the system yet." (Mavilla Dep. 15-16.)[16]

---

[16] ECF No. 57 Tab Y.

On June 27, 2013, after being informed of the investigation, Pope entered the HR Direct System and reported for the first time the additional 14 paid days off that he told Badamo in his June 27 email that he had taken. (Pope Dep. 74-75 & Ex. D-3.) Plaintiff was not able to explain why in 2013 he had failed to enter paid days off in the system, if he had actually taken those days off, until after he learned of the investigation. (Pope Dep. 76.)

Defendant asserts that the failure to report taking paid days off is considered stealing time from the Company, since an employee would never exhaust his paid days off unless and until he was caught not entering them. (Badamo Dep. 144-145 & Ex. P-5 at 3-4; Pope Dep. 74 & Ex. D-3.) Plaintiff responds that Bayer maintains no policy that the failure to record days off within some unspecified amount of time constitutes theft of company time— Badamo was simply expressing his opinion on the topic. Zervoudis indicated that he was not sure whether failure to enter time in the tracking system would be "theft of time" if the individual had not exceeded his or her vacation days at the end of the year. (Zervoudis Dep. 56-57.) Plaintiff further notes that Mavilla testified that "there was no set time" for entering days off in the HR Direct system but that "HR would catch up with you and say you were on vacation for X amount of days, you don't have it in your system yet." (Mavilla Dep. 14-15.)

Badamo updated the calendar, giving Pope the benefit of the doubt on his claims to have been working at home, off sick, or on vacation, despite the violation of policy on not reporting the paid days off, and updated the color-coded calendar. He also credited Pope with days when expense reports showed he had traveled. There remained 31 work days that were not accounted for at all, even by Pope. (Badamo Dep. at 184, 196-97 & Ex. P-6 at 2.)

Plaintiff contends that the record does not support Defendant's statement that the 31 days were "not accounted for at all." First, according to Bayer, the badging activity is unreliable as a

measure of attendance. (30(b)(6) Dep. 220; see also Badamo Dep. Ex. P-7 (email from Sion to Badamo questioning how reliable badging activity could be, considering "you could get in or out with somebody else"). Second, Pope sent emails on many of the days marked as red on the updated calendar. (Badamo Dep. Ex. P-20). Third, Pope offered a number of possible explanations for the days in question, including testifying that on occasions he entered the building with other employees without scanning his badge and stating that his grandson had misplaced his badge. (Pope Dep. 56, 70; Badamo Dep. 125-26.) Employees who misplaced a badge could be issued a visitor's badge. (Skeba Dep. 15.) In support of these possibilities, Skeba, the security receptionist at Pope's work building, testified that on several occasions in 2012 he either gave Pope a visitor's pass or let him into office without Pope having his badge. (Skeba Dep. 17-18.)

Badamo believed Pope when Pope informed him that his grandson had misplaced his badge at some point in 2013. (Badamo Dep. 126.) Yet, Badamo did not think about whether Pope's grandson misplacing his badge explained some of the days that showed no badging activity. (Badamo Dep. 129.) In fact, Badamo claims he did not think that Pope referred to his grandson misplacing his badge to explain the unexplained days in the badging activity report. (Badamo Dep. 130.)

Zervoudis does not recall being informed about Pope's claim that his grandson had misplaced his badge for a time in 2013. (Zervoudis Dep. 58.) Defendant notes that Zervoudis did not think it was significant because if a badge is misplaced a new one can and should be obtained immediately (within a few hours). (Zervoudis Dep. 58.)

Zervoudis perceived there to be a "huge number of absences" based upon his early conversations with Badamo, and he took as fact that Human Resources "knew what it was

doing." (Zervoudis Dep. 38.)  Zervoudis accepted the number of days in question from Badamo. (Zervoudis Dep. 38.)

Plaintiff indicates that, if he obtained a visitor's badge, his badging activity with the visitor's badge would not appear on his personal badging activity report. (Badamo Dep. 127.) Defendant notes that this would not be the case with a replacement badge.

Badamo believes it is possible that Pope was in Building 14 on days where his personal badging activity report shows no badging activity. (Badamo Dep. 63-64, 127.)  Badamo "do[es]n't know exactly" how Pope could have attempted to explain his whereabouts on days he had not badged into the building by doing anything other than accounting for what he had done the entire year up to the point of the beginning of the investigation. (Badamo Dep. 133-34.)

The practice whereby one or more employees would enter Building 14 after another nearby employee had swiped his or her badge without swiping his or her own badge was known as "tailgating" or "piggybacking." (Pope Decl. ¶ 12; Skeba Dep. 12.)  Plaintiff states that "tailgating" or "piggybacking" was a common practice, and employees were not disciplined for entering Building 14 in that manner. (Yeh Dep. 29; Skeba Dep. 11-12; Pope Decl. ¶ 14.) Defendant responds that other witnesses have testified that it is rare for this to happen. (Sion Dep. 43.)  The parties dispute whether Pope also cited "tailgating" or "piggybacking" as a likely explanation for some of the days for which there was no badging activity (Pope Dep. 56; Pope Decl. ¶¶ 12-14; compare Badamo Dep. 131-32).  Regardless, Badamo acknowledged that he considered the possibility of Pope tailgating and that it was a possibility that Pope might have been present in the office without the badging activity report indicating any presence. (Badamo Dep. 63-64.)

Badamo's testimony was that he assumed that Plaintiff was not working "if there was no swiping into the building, no e-mail traffic, no digital footprint in the Procurement system, anything." (Badamo Dep. 44.) For days that Pope could provide an explanation, Badamo claims he took Pope at his word. (30(b)(6) Dep. 42.)

Pope has always understood the badging system for entry into Building 14 to be a security measure and not something designed to track attendance. (Pope Decl. ¶ 11; Skeba Dep. 11-12.) Plaintiff contends that he would often "piggyback" and on some occasions would have security let him into the building with or without obtaining a visitor's badge. (Pope Decl. ¶ 13; Pope Dep. 62; Skeba Dep. 17-18, 20.)

<u>The Investigation Expands</u>

Defendant states that Badamo's investigation at first focused on Plaintiff's physical attendance at work, but then expanded to encompass theft of company time (as a result of not entering vacation days into Bayer's system), and insufficient evidence of work (as a result of a lack of remote business activity during days when Plaintiff was supposed to be working). (Badamo Dep. 13-15, 41, 222.)

Plaintiff responds that, as to the "theft of company time" issue, that argument presented by Defendant is nothing more than a post hoc reason for termination emphasized for the first time in this lawsuit. <u>See</u> Bayer's EEOC Position Statement (ECF No. 47 Tab I) (making no mention of "theft of company time" as a reason for discharge); <u>see also</u>, <u>e.g.</u>, Oct. 23, 2013 Email from Badamo to Jennifer Hubal (Bayer-00388)[17] (recapitulating the investigation and outcome of investigation of Pope, making no mention of "theft of company time" as a result of failing to log time in the HR Direct system). Second, according to Badamo, any review of the

_____

[17] ECF No. 47 Tab J.

sufficiency of Pope's work when he claimed to be working from home ultimately collapsed into nothing more than the attendance issue that was the original focus of the investigation. (Badamo Dep. 58.)

Badamo also reviewed Plaintiff's email activity during his investigation, in order to determine whether it substantiated Plaintiff's claim that he was actually working at home for 10 of the days he was missing. (Badamo Dep. 29.) Plaintiff responds that Badamo testified his purpose in reviewing Pope's emails was to "find information that just pieced together a six-, seven-month work pattern." (Badamo Dep. 30.) Furthermore, Badamo's review could not have yielded a substantiation of Plaintiff's claims regarding working from home because: (a) Badamo had no baseline with which to compare Pope's email activity (either with respect to Pope himself or within Pope's department) (Badamo Dep. 31); and (b) Badamo himself concluded "it appears that emails are not a regular part of [Pope's] job." (July 15, 2013 Email from Badamo (Bayer-00389.)

Badamo reviewed Plaintiff's 2013 email from both a quantitative and qualitative perspective, and created a chart showing Plaintiff's email activity on days when Plaintiff claimed to be working from home and days without any badge swipe activity or other evidence of him working. (Badamo Dep. 63, 186-187 & Ex. P-20.)

Badamo found a surprisingly low level of email activity for a Bayer employee, particularly one whose job involved written contracts and communications with various third parties. (Badamo Dep. 30, 86 & Ex. P-20.) Plaintiff responds that his email usage in 2013 was similar to his email usage in 2012, during which time there is no criticism of his work. (ECF No. 47 Tab K) (reflecting that, on average, Pope sent only 8 emails less per month in 2013 than 2012

and revealing that Pope only sent about 100 emails per month, even in 2012)). Pope also notes that Yeh observed that he (Pope) did not use email much. (Yeh Dep. 24.)

In addition to analyzing Plaintiff's building entry records, HR Direct entries, email activity, and his own explanations of his whereabouts, Badamo had discussions with other department employees to better understand Plaintiff's position and whether the department had specific practices with regard to working from home. (Badamo Dep. 107.)[18]

Working From Home

Bayer permits employees to work from home in two situations: on an exception basis (e.g., if something comes up at home such as a delivery that the employee needs to be present for), or by way of a formal, Flexible Work Options schedule the employee arranges with Human Resources. (Badamo Dep. 114, 117-119, Ex. P-2 (see Bayer-00201-202).) Plaintiff responds that it is undisputed that Bayer's policies speak to Flexible Work Options. However, there is no contention that Pope was using a formal Flexible Work Option schedule (Badamo Dep. 15), so this policy is immaterial. Pope disputes that "exception based" working from home can be defined as situations where "something comes up at home such as a delivery that the employee needs to present for." Pope testified that he and other PROTRA employees were informed in staff meetings that they could work from home as long as doing so did not "interfere with meetings or other business that required any sort of on-site presence" and that employees were told to "use [their] professional discretion when doing so." (Pope Dep. 91-92.) Pope's testimony was supported by the testimony of Eric Yeh. (Yeh Dep. 21, 61-63) (testifying that Friede

_____

[18] Plaintiff argues that Badamo may have spoken with Riggs Botta about his understanding of working from home protocol (Badamo Dep. 107), but any statements made by Botta are immaterial because Botta was not Pope's supervisor. (Pope Decl. ¶ 67.) However, this argument is not responsive in that Defendant indicated that Badamo spoke to other employees, not just Plaintiff's supervisors.

permitted him to work from home as needed due to the demands of his job, which included international conference calls at hours outside the normal workday and that his ability to work from home was not limited to days where "something comes up")).

Bayer states that, although it did not have written policies regarding working from home on an exception basis, employees were required to, at a minimum, inform their supervisors if they were planning to work from home. (Badamo Dep. 117-120, 122, 221; Zervoudis Dep. 68, 71.) Plaintiff contends that employees had to make it known they were working from home, but that this requirement did not require specifically informing a superior. (Pope Dep. 92.) As such, Pope consistently informed Mavilla when he planned to work from home. (Mavilla Dep. 30.) He also notes that Sion sent an email to him requesting a "short info" when he would be out "for more than 3 days"—suggesting that he was not required to do so for shorter absences. *(*March 20, 2013 Email from Sion to Pope (Bayer-00389).[19] Furthermore, he notes that Sion's initial response to Badamo's request for information on PROTRA policies related to working from home did not contain any reference to a requirement that supervisors be notified when an employee planned to work from home. (Badamo Dep. Ex. P-7.)

Defendant asserts that Plaintiff did not have any special arrangement whereby he was permitted to work from home without informing his supervisors, nor did he have a formal Flexible Work Options schedule. (Badamo Dep. 120; Zervoudis Dep. 68, 71, 84; Friede Dep. 63, 66; Sion Decl. ¶¶ 7, 8.) Plaintiff notes that Badamo himself concluded Pope did not need permission to work from home. Therefore, a "special arrangement" would not have been necessary. (Badamo Dep. 119-20.)

---

[19] ECF No. 47 Tab J.

Defendant notes that, when Sion and Zervoudis spoke with Plaintiff about the attendance investigation and Bayer's work from home policies, Plaintiff never told either of them that he had been authorized by Friede or any other managers to work from home whenever he could do so without disrupting his work. (Zervoudis Dep. 83-84; Sion Decl. ¶ 8.)  Plaintiff responds that Badamo's handwritten notes made during the investigation specifically reveal that Pope did tell Badamo that he had an established working from home policy with Friede. (Badamo Dep. 112; Dep. Ex. P-9 (Bayer-00094[20]). Pope believes Zervoudis was likely present when he provided this information to Badamo (Pope Decl. ¶¶ 39-41). Additionally, Sion's email recap from his "telco" with Pope the day after Pope's first meeting with Badamo expressly indicates: Pope "mentioned that [he] has worked a certain number (around 10) days from home. Explained that in Bayer we do not have a guideline regarding the handling and max number of days acceptable." (Dep. Ex. P-25 (Bayer-00527).)

Pope contends that he could complete aspects of his job from home just as easily as he could in Building 14. (Pope Decl. ¶ 8; Friede Dep. 61-62.)  Defendant denies this statement as being too general.  (Sion Dep. 37) (most functions require one to be at work).

Plaintiff contends that his colleague, Eric Yeh, had no trouble reaching him when he was not in the office. (Yeh Dep. 21, 26.)  Defendant notes that Yeh also testified that it would take Pope varying times to respond to his phone calls and sometimes a day or longer to reply to emails. He testified that Pope's working at home would cause him to reschedule items to dates when he knew that Pope would be in the office. (Yeh Dep. 39, 63.)

Pope had no prior attendance issues that anyone could recall. (Badamo Dep. 96.)

---

[20] ECF No. 47 Ex. M.

Specifically, Pope had no problems with work attendance in 2012. (Friede Dep. 67). Friede did not recall any issues with attendance in 2012. Friede would have "probably picked up on someone not showing up [i]f someone wouldn't show up for several consecutive days without letting us know." (Friede Dep. 71.)

Pope maintained the same attendance habits over the several years prior to his termination. (Pope Decl. ¶ 18; Mavilla Dep. 21, 24; see also Yeh Dep. 24 (indicating that, if anything, Pope came to work more in 2013 than he did in 2012). Defendant notes that Yeh testified that Plaintiff's attendance improved after the investigation by Badamo commenced. (Yeh Dep. 44-45.)

As global purchasing manager, part of Pope's job included negotiating contracts for various types of packaging utilized by Bayer in its business. (Pope Decl. ¶ 4.) The term of those contracts was typically between 2 and 5 years. (Pope Decl. ¶ 5.) As a general rule, because renegotiation of contracts was a very involved process, Bayer typically sought to have major contracts staggered in the sense that one major contract per year would be up for renewal. (Pope Decl. ¶ 6.) In 2013, there were no expiring packaging contracts, so Pope did not have a need to correspond regarding any expiring contracts, either by phone or email. (Pope Decl. ¶ 7.)

Pope was the primary employee tasked with onboarding Yeh when Yeh was hired as a packaging technician in June 2012. (Yeh Dep. 7.) Yeh and Pope collaborated together on many aspects of their jobs given the close relationship between their positions. (Yeh Dep. 10-18.) In working with Pope beginning in June 2012, Yeh observed that Pope did not use email much. (Yeh Dep. 7, 24.) Defendant notes that, while Yeh so stated, it is unclear how he was in a position to know this. He also said that Pope was in the office only 1 or 2 days a week typically.

(Yeh Dep. 49-51.) Yeh interacted with Pope's replacement and had no dealings that suggested Pope's job performance was deficient in any way. (Yeh Dep. 29-30.)

The PROTRA department's former administrative assistant (through April 2013), Carol Mavilla, testified that Pope used quiet rooms more frequently than others. (Mavilla Dep. 27, 33). Badamo did not interview Carol Mavilla during his investigation. (Mavilla Dep. 31.)

Plaintiff notes that Mavilla served as the administrative assistant to the Bayer procurement department between 2010 and 2013. (Mavilla Dep. 5-6.) Sion indicated that Mavilla was responsible for tracking the attendance of PROTRA employees while Sion served as Pope's administrative boss in Pittsburgh. (Sion Dep. 14.) Mavilla reported directly to Sion, and after Sion departed Pittsburgh, she reported to Friede. (Mavilla Dep. 35.) Part of Mavilla's responsibilities included keeping a running itinerary for the PROTRA department. Mavilla was required to compile weekly attendance records that were sent out to the department every Friday. (Mavilla Dep. 17.) Defendant notes that Friede had no recollection of this. (Friede Dep. 119.) Mavilla also maintained an "in and out" board that indicated when a Procurement employee was in a meeting, out to lunch, or otherwise not in the office. (Mavilla Dep. 17-19.) According to Mavilla, Pope's attendance habits were consistent while Mavilla served as the PROTRA administrative assistant. (Mavilla Dep. 29.) Mavilla testified that Pope was better than most at informing her of any time he expected to be out of the office. (Mavilla Dep. 31-32.)

The Bayer PROTRA department did not maintain any written policies regarding working from home on "an exception basis." (30(b)(6) Dep. 221; Badamo Dep. 141-142; Pope Dep. 68-69, 91-92; Badamo Dep. Ex. P-7 (Bayer-00675) (Sion stating "We (PROTRA) do support home office days on an exception base and but (sic) have not fixed any rules"); Sion Dep. 42-43, 53-54 (acknowledging that there were no fixed rules for working from home and noting that sometime

after the investigation of Pope was underway, Sion had a discussion with Uwe-Scholz regarding setting rules for working from home).  Mavilla testified that more than half of the employees in procurement spent time working from home. (Mavilla Dep. 34.)

Plaintiff notes that, in approximately 2010, Bayer's United States President and CEO Greg Babe gave a yearly address to Bayer employees in which he encouraged those employees to work from home in an effort to achieve a proper work/life balance. (Pope Decl. ¶ 19; Piotrowski Decl. ¶ 29;[21] Piotrowski Dep. 44-45 & Errata sheet at 4[22]) (stating that Babe said "if you had the type of job where [your] supervisor, you know, said it was okay to remotely work, remotely work").

When working from home on an exception basis, Bayer PROTRA employees were not obligated to connect to Lync. (Badamo Dep. 79-80, Ex. P-7 (Bayer-00675).)  Even though Sion clearly indicated to Badamo that PROTRA employees were not required to be on Lync when working from home, in his investigation, Badamo concluded that there was an expectation that Pope should have been on Lync when working remotely. (Badamo Dep. 85.)  However, Badamo indicated that there were no records of Lync activity, so he could not check on this issue. (Badamo Dep. 85-86.)

Bayer does not maintain a policy requiring PROTRA employee to send or receive a certain number of emails each day. (30(b)(6) Dep. 45-46.)  Bayer does not maintain a written policy requiring Bayer employees to demonstrate a certain amount of remote business activity when working from home. (30(b)(6) Dep. 14.)  Plaintiff contends that the parties dispute whether PROTRA employees needed to notify their supervisors when they intended to work from home. Pope maintains he had numerous discussions with his direct supervisors about working from

---

[21] ECF No. 47 Tab O.
[22] ECF No. 37 Tab G.

home. During those discussions, Pope's supervisors, including Friede and Sion, indicated that PROTRA employees could work from home at their professional discretion so long as they did not need to be in the office and that the employees were not required to notify their supervisors. (Pope Dep. 68-70, 91-92; see also March 20, 2013 Email from Sion to Pope (Bayer-00389)[23] (Sion directing Pope to "send a short info" when he will be "out [of the] office for more than 3 days" to Sion and Uwe-Scholz); Yeh Dep. 21, 43-44, 61-63 (Friede stated in a group meeting "when you need to work from home, work from home," which Yeh interpreted to mean Friede was instructing Yeh that he had the option of working from home due to the demands of Yeh's job in packaging, which included early and late conference calls in other regions of the globe). Bayer maintains that Pope was required to notify his supervisors when he planned to work from home. (Sion Dep. 41, 43; Zervoudis Dep. 71; Friede Dep. 115-16; Badamo Dep. 120.)

Ultimately, Badamo concluded that there were 42 business days in 2013 where there was insufficient evidence to conclude that Pope was working. (Badamo Dep. 184 & Ex. P-6.) Of the 42 days, 31 were days where Badamo could find no evidence of Pope's attendance, and 11 were days where Pope claimed to be working from home but sent either very few emails or no emails at all. (Badamo Dep. 184, 196-97, Ex. P-6, Ex. P-11 (see page Bayer-00507).) Plaintiff responds that Badamo did not have access to his emails at the time the July 2, 2013 email (Dep. Ex. P-11) was drafted. (July 27, 2013 Email to Badamo (Bayer-00400). See Badamo Dep. Ex. 23.[24]

<u>Second Meeting</u>

Badamo had a second meeting with Pope on July 9, 2013 (Pope Decl. ¶ 40; Email from Badamo to Pope (Bayer-05022). Plaintiff contends that, during that meeting, he explained that Friede had instructed him that he could work from home so long as it did not interfere with his

---

[23] ECF No. 47 Tab J.
[24] ECF No. 47 Tab. N.

work and so long as he got his job done. He explained that Friede had trusted him to use his professional discretion in choosing to work from home and that where he was able to perform work from home, he often did. (Pope Decl. ¶ 41.) Pope also again brought up the fact that his grandson had misplaced his badge for a period of time in 2013 and the fact that he had likely "piggybacked" into Building 14 on numerous occasions throughout the year. (Pope Decl. ¶ 42.) Defendant denies the "piggybacking" possibility being raised. (Badamo Dep. 131-32.) In response, Badamo stated he could legitimately give Pope credit for 15 days, but he stated that 16 days without explanation would still remain. (Pope Decl. ¶ 43.)

Badamo made handwritten notes on a printed copy of a July 2, 2013 email, which Pope believe to be notes of the discussion that took place in the July 9, 2013 meeting he had with Zervoudis and Badamo. (Pope Decl. ¶ 41; Badamo Dep. Ex. P-9 (Bayer-00094)). Badamo's written notes represent answers Pope gave to him during a meeting. (Badamo Dep. 112.) Among other notes, Badamo wrote "Michael – OK w/ WFH – as long you get your job done," and "If I can do it from home – I will." (Badamo Dep. Ex. P-9 (Bayer-00094)). Similarly, Badamo's email recapping the July 9, 2013 meeting states: "Observations that we reviewed: Working from home practices: § Response: Had an agreement." (ECF No. 47 Tab R.)  However, Badamo noted no response from Pope to the next point, "There are thirty-one days with no swipe record nor was an explanation provided."

<u>Pope Meets with Friede</u>

On July 10, 2013, Pope contacted Badamo on Lync to request that Badamo meet with Friede, who happened to be in Pittsburgh on that date. (Dep. Ex. P-12)[25] (stating "hi jeff, sorry to

_____

[25] ECF No. 57 Tab CC.

disturb you but i wanted to let you know that michael friede was in Pittsburgh and is planning to be in building 14 @1:00, maybe it makes sense to get his input because he was my administrative boss for about 2 yrs ending this march. he was open to the idea that from time to time it was ok to WFH"). Later in the same day, Pope phoned Friede in an effort to schedule his own meeting with him to discuss the investigation of Pope's attendance. (Pope Decl. ¶¶ 45-46). Defendant notes that Friede denies this. (Friede Dep. 77, 86-87 & Exs. 2, 3.) According to Pope, when he reached Friede, Friede stated, "I already know what this is about." (Pope Decl. ¶ 47.) Friede indicated that he would meet with Pope in Friede's old office after the workday. (Pope Decl. ¶ 48.)

Prior to his meeting with Friede, Pope informed Badamo (via Lync) that he would be meeting with Friede at 5:15 on the Bayer campus that afternoon. (Pope Decl. ¶ 49; Dep. Ex. P-12 (Bayer-05020)). Badamo indicated that he did not need to meet with Friede. (Dep. Ex. P-12.) Pope met with Friede at 5:15 in Bayer's Building 14 in the office of Demetri Zervoudis (formerly Friede's office). (Pope Decl. ¶ 50.) Plaintiff asserts that, in the conversation, Friede's statements clearly indicated that he was completely aware and fully informed regarding the investigation of Pope's attendance. (Pope Decl. ¶ 51.) Friede denies this. (Friede Dep. 77, 86-87 & Exs. 2, 3.) Pope asked Friede what he felt was going on with the investigation and how serious it was. (Pope Decl. ¶ 52.)

According to Pope, Friede indicated he was aware of the anonymous letter, and he stated that if the matter went into the ombudsman or compliance office then it must be something serious. (Pope Decl. ¶¶ 53-54.) He also indicated he "understood" Pope was under investigation for attendance and that a number of days were in question. Friede indicated that he "believe[d] it to be" 42 days. (Pope Decl. ¶ 55.) Pope restated his understanding of the work from home

procedure he had with Friede through words to the effect of, "We have always had an agreement that based upon professional discretion I could work from home." (Pope Decl. ¶ 56.) Pope stated that he understood Friede's rule to be that as long as he did his job it did not matter where he did it. (Pope Decl. ¶ 57.) According to Pope, Friede agreed with him and indicated that results are what count. (Pope Decl. ¶ 58.) Pope also discussed the fact that his Key Performance Indicators (KPIs) showed him to be at or above the expected goals as reflected in all of the KPIs. (Pope Decl. ¶ 59.) Friede agreed and indicated that Pope had always performed well on KPIs. (Pope Decl. ¶ 60.) Friede also stated words to the effect of, "Art, they have no legal basis to stand on if they are using badging activity because you could piggyback or be buzzed in. It is not a reliable source for the information." (Pope Decl. ¶ 61.) Friede also stated words to the effect of, "If this situation becomes a legal situation, Bayer could never win it." (Pope Decl. ¶ 62.)

Friede stated that he recalled the meeting being about supply chain financing and maybe rotating Pope out of the Packaging Department, but not his attendance issues. (Friede Dep. 76-77.) Pope claims that they did not discuss supply chain financing at any point in the meeting with Friede. (Pope Decl. ¶ 63.) Because Pope just had a follow-up meeting with Badamo the prior day, the only purpose Pope had in speaking to Friede was to review the investigation and to solicit his input in the matter. (Pope Decl. ¶ 64.)

Plaintiff notes that, the day after his meeting with Friede, Badamo requested access to his email. He received access to Pope's email on July 15, 2013 (Badamo Dep. Ex. P-23 (Bayer-00400)). Defendant indicates that that this request was not part of the investigation, but intended to assure that customer contacts and other company business would be covered after Pope's termination. (Badamo Dep. 199-202.)

Plaintiff asserts that Badamo reviewed his email and claimed that Bayer ultimately considered his email activity in its decision to terminate him. (30(b)(6) Dep. 222). Defendant responds that Badamo did review Pope's email activity in his investigation to help determine his work patterns, and found surprisingly low usage. However, that was early in the investigation. (Badamo Dep. 29-30.) Despite the purported review of email activity, Badamo testified that by the end of the investigation, Pope's attendance and email activity or lack of remote business activity "related to the same issue." (Badamo Dep. 57-58.) In reviewing Pope's email activity, Badamo had no quantifiable baseline for evaluating Pope's email activity and its effect on his investigation. (30(b)(6) Dep. 31). Badamo claims he looked for emails to "piece together a six-,seven-month work pattern" and to "substantiate work activity." (Badamo Dep. 30, 116.) Badamo specifically did not review days on which Pope badged into Building 14 to establish a baseline for Pope's use of email on days he worked at the office. (Badamo Dep. 150.)

Pope's email activity reflects that in 2012 he sent an average of 101 emails per month, and in 2013, he sent an average of 92 emails per month. (Def.'s Supp. Resp. Pl.'s First Set of Interrogs.)[26] Defendant notes that this includes emails that were sent when Pope was in the office, whereas Badamo was reviewing email activity on days that Pope said he was working at home. Badamo eventually concluded "it appears that emails are not a regular part of [Pope's] job." (July 15, 2013 Email from Badamo (Bayer-00389.)

Plaintiff contends that, despite this conclusion, and even though Badamo had no quantifiable baseline representing Pope's historical email activity and Bayer had no minimum requirement for emails, Badamo came up with a personal expectation as to the amount of emails Pope should have sent if he was actually working. (30(b)(6) Dep. 45-46.) Badamo had to educate

_____

[26] ECF No. 47 Tab K.

himself on what Pope's job entailed in order to conduct his investigation of Pope. (Badamo Dep. 60-61.)

In reviewing Pope's emails, Badamo alone made the decision on whether to "count" a particular email as reflecting work activity on a given day. (Badamo Dep. 62-63.) Badamo made a judgment based upon whether there were any work-related emails sent as to whether a work from home day should be counted, as opposed to one email saying "I'm working from home." (Badamo Dep. 62-63.) Badamo counted only those emails he deemed to be substantively relevant to evidencing work activity when he tallied Pope's emails. (Badamo Dep. 187-88).

Badamo did not give Pope an opportunity to discuss his email activity or the frequency with which he typically used email. (Badamo Dep. 135.) Badamo did not provide emails to Sion or Zervoudis to be reviewed for substantive relevance. (Badamo Dep. 188.)

On occasions where Badamo's review of emails located email evidence to suggest that Pope had an explanation for not being present in Building 14, Badamo did not recall if he updated his calendar to reflect the reason for Pope's absence on the particular day noted in email or "give Pope credit" for the day. (Badamo Dep. 190-91.) On the same day Badamo obtained access to Pope's email, an email was sent to PROTRA managers and Business Unit managers with the subject of "Meeting Minutes / Action Items ==> US & Pittsburgh HR Discussions." (July 15, 2013 Email (Bayer-001173-1208).[27] A PowerPoint presentation, which was attached to the email, included specific instructions on "ad hoc" working from home and procedures to be followed in doing so. (Id. at Bayer-001199-Bayer-001201). Those instructions included directives to (1) ask a supervisor before working from home, (2) sign in to Lync and note in

---

[27] ECF No. 47 Tab S.

Lync status if working from home, (3) set-up office phone to ring to PC, and (4) set up a home workstation that is ergonomically correct. (Id.)

Three days after Badamo obtained access to Pope's email, Zervoudis indicated, on behalf of Pope's supervisors, that they collectively believed Pope must be terminated. (Zervoudis Dep. 64-65; Dep. Ex. P-15).[28] Defendant notes that there was no connection to the emails. Four days later, on July 22, 2013, Badamo and Zervoudis met with Pope to inform him that he was being terminated. (Pope Dep. 49-50; Badamo Dep. 174.)

The Investigation Concludes

Defendant indicates that, upon concluding his investigation, Badamo reported his findings to Zervoudis, Sion, and Bayer's in-house counsel, who together made the decision on July 18, 2013 to terminate Plaintiff's employment effective July 22, 2013. (Badamo Dep. 7, 11, Ex. P-16; Zervoudis Dep. 46-49; Sion Decl. ¶¶ 4-5.) Zervoudis also discussed the decision to discharge Plaintiff with Thomas Udesen, who served as the global head of the Procurement Department. (Zervoudis Dep. 5, 49, 77 & Ex. P-26.) At the time of Plaintiff's discharge, Badamo was 45 years old, Sion was 49 years old, Zervoudis was 55 years old, and Udesen was 41 years old. (Hassan Decl. ¶¶ 6-9.)[29] Plaintiff was 51 years old. (Hassan Decl. ¶ 5.)

Bayer contends that the reason for terminating Plaintiff's employment was excessive unexplained days off work (Rule 2.1) and other misconduct associated with attendance. (Badamo Dep. 11- 12, Ex. P-2.) This included theft of company time as a result of not entering vacation days (13), and lack of remote business activity, i.e., insufficient digital footprint (emails and internet usage) which indicated that Pope was not working when he said he was. (Badamo Dep. 7, 11-15, 222, Ex. P-2 (see Bayer-00137); Zervoudis Dep. 56, 68, 79, 82; Sion Decl. ¶ 7.)

---

[28] ECF No. 57 Tab DD.
[29] ECF No. 37 Tab F.

Plaintiff disputes that Rule 2.1 provides any clear policy which he could have been found to have violated because the rule itself simply states that employees must conform with unidentified attendance standards set by the company. (Badamo Dep. Ex. P-2 (BAYER-00137). Plaintiff maintains that his attendance comported with attendance standards discussed by him with his supervisors. Plaintiff further disputes whether a delay in entering vacation days constitutes theft and whether that conduct was even a purported reason originally given for his termination. He argues that Defendant's basis for claiming remote business activity as a basis for termination is even more nebulous since Badamo himself testified that by the end of the investigation, Pope's attendance and email activity or lack of remote business activity "related to the same issue." (Badamo Dep. 57-58.) Moreover, Badamo's review of email was done without any frame of reference for determining whether Pope's email usage indicated a lack of work, and Pope's "internet usage" did not violate company policy and was only available for the prior 45 days. (Badamo Dep. 177-79; see also Badamo Dep. 180 (stating that the internet usage review "slightly moved the needle" in a negative direction but that it did not affect Badamo's view of Pope's attendance)).

Defendant indicates that Friede, Plaintiff's previous Administrative Supervisor, was not involved in the decision to discharge Plaintiff and did not even know about the anonymous letter, Badamo's investigation, or Plaintiff's discharge, until at least August or September 2013—after Defendant discharged Plaintiff. (Friede Dep. 73-74, 78-79, 83.) Plaintiff argues that Friede's claims of noninvolvement are belied by other evidence in the case. Pope claims that he spoke directly to Friede about the investigation into his attendance on July 10, 2013 (Pope Decl. ¶¶ 46-62) and lobbied for Badamo to speak with Friede regarding the established work from home protocol Pope had with Friede. (Dep. Ex. P-12 (Bayer-005020); Dep. Ex. P-9 (Bayer-00094)).

According to Plaintiff, when he spoke to Friede about the investigation, Friede was knowledgeable about the details. (Pope Decl. ¶¶ 51, 53-55, 61-62.) Badamo testified inconsistently about the contact he had with Friede regarding the investigation. (Badamo Dep. 19 ("I reached out to Friede, yes. I asked him some clarifying questions just to help me understand."), 37 ("I do not recall asking [Friede] anything let alone how to investigate"), 93 ("I don't recall any of the conversations with Michael Friede. I recall having a hard time getting ahold of him."), 113 ("I talked to Michael at some point about working from home and it was . . . it is permissible.").

According to Badamo, Friede would have had the best read on Pope's attendance from the start of his serving as Pope's administrative boss through December 2012. (Badamo Dep. 94-95.) Friede claims he had no knowledge regarding the investigation until after Pope was terminated. (Friede Dep. 73-74, 78-79, 83.)

Zervoudis identified Friede as someone likely to have important information and testified that he spoke with Friede about the investigation. (Zervoudis Dep. 19, 59, 61; Dep. Ex. P-8 (Bayer-00672)). Plaintiff contends that these inconsistencies support an inference that Friede was involved in the process, especially in light of the fact that Friede is responsible for ageist comments directed at Pope.

Defendant indicates that neither Friede, McEvoy, nor Hellemann Sorenson was involved in the investigation of Plaintiff's attendance or the decision to discharge him, and none of these men was informed of the investigation or decision until after Plaintiff's discharge. (Badamo Dep. 7, 36, 220; Sion Decl. ¶ 6.) Plaintiff contends that Badamo testified inconsistently about whether he spoke with Friede and that Badamo spoke with McEvoy generically about working from home as part of his investigation of Pope. (Badamo Dep. 141-42.) Plaintiff testified that none of

his three supervisors at the time of his discharge—Sion, Zervoudis, and Uwe-Scholz—and no one in Human Resources made any statements that would suggest a bias against older employees. (Pope Dep. 107-08.)

Plaintiff notes that Bayer's decision to terminate him was not related to his performance of his job duties and attainment of job objectives. (Badamo Dep. 219; Sion Dep. 89.) As of May 2013, Pope was meeting or exceeding expectations, as measured by Bayer's KPIs. (May 2013 KPIs (P00003-P00098)[30]; Pope Decl. ¶¶ 23-25). Badamo did not review Pope's job performance vis-à-vis KPIs during his investigation. (Badamo. Dep. 140.)  Pope indicates that he was assigned to a performance improvement plan in March 2012, and he successfully completed the improvement plan before the end of 2012. (Badamo Dep. 71-72; Freide Dep. 104.) Pope's termination did not relate to his successfully-completed improvement plan from 2012. (30(b)(6) Dep. 218-19.)

Pope contends that he was replaced by a 29-year old employee. (Pope Dep. 109.) Defendant responds that Badamo testified that the job was downgraded to a lower level position after Plaintiff's termination. There is no evidence of a replacement. (Badamo Dep. 100.)

Bayer maintains a progressive discipline policy. (Badamo Dep. Ex. P-2 (Bayer-00139); Badamo Dep. 209-10.) In choosing to terminate Pope against the backdrop of a progressive discipline policy, Badamo made the decision that Pope's behavior could not be corrected. (Badamo Dep. 210-11.) Badamo acknowledged Pope was not given an opportunity to correct the behavior for which he was terminated. (Badamo Dep. 211.)

Plaintiff notes that Badamo did not investigate any other PROTRA employees, as a result of the anonymous letter despite Zervoudis's concern about the claim in the anonymous letter—

---

[30] ECF No. 47 Tab P.

that the problem behavior had been "observed . . . for years" and was purportedly "affecting the morale of the department and causing others to start to behave in the same way"—and Zervoudis's instruction to Human Resources to investigate those claims and ensure the department's policies were clear. (Badamo Dep. 31-32; Zervoudis Dep. 62.) Defendant admits only that Badamo did not investigate any other PROTRA employees as a result of the anonymous letter. The remainder is denied as not supported by the cited testimony. The letter identified only one person who was not coming to work – Pope.  Specifically, Badamo did not investigate Yeh, even though McEvoy indicated to Badamo during his investigation that the packaging department was in need of formalized work from home rules.  (Badamo Dep. 205.) Yeh was the only other global packaging employee other than Pope located in the United States. (Friede Dep. 34.) Yeh worked from home two to three days per week on average from January 2013 to July 2013. (Yeh Dep. 65.) Yeh was 37 at the time of Bayer's investigation of Pope. (Pope Decl. ¶ 26.)

Age Bias Statements

Plaintiff claimed during his deposition that on several occasions, he overheard statements indicating a bias against older employees, either directed at him or to a group of Bayer employees that included him. (Pope Dep. 96-108.)  The first occasion was during a departmental team building exercise in January 2012 when the moderator asked the group to stand in a line based on seniority. (Pope Dep. 96-97; Friede Dep. 95-98, 117 & Ex. 1 (see Bayer 07212-07213).)  Plaintiff claims that Friede, who was his Administrative Supervisor at the time, commented that the group was "heavy on age" and needed to "get younger." (Pope Dep. 97.)

Richard Piotrowski, a former PROTRA employee, stated in his declaration that after Friede asked the department to line up in order of seniority he felt "as though this was done in a

manner that drew attention to the older age of a number of the members of the Department." (Piotrowski Decl. ¶ 19.)

Piotrowski believed there was a sentiment within management that older employees shouldn't receive "exceeds expectations" as a rating. (Piotrowski Dep. 51-52.) When Piotrowski served in a managerial role that saw him evaluate employees, his superior, Jay Strunk, advised him that he could not give an older employee "a performance evaluation that would result in a greater than average merit increase because they wanted to give the money to the younger folks." (Piotrowski Dep. 16, 23, 59, 61.) Piotrowski had his performance evaluation for the older employee returned to him by Strunk, with the instruction "this won't work" regarding his "exceeds expectations" review of the older employee. (Piotrowski Dep. 19-20.)

At the same time, Piotrowski was permitted to retain the "exceeds expectations" rating he had given to the younger employee he supervised at the time. (Piotrowski Dep. 23.) McEvoy later became Piotrowski's supervisor, and Piotrowski believes McEvoy had the same outlook on evaluations of older employees. (Piotrowski Dep. 17.) While McEvoy was Piotrowski's supervisor, he told Piotrowski that if he were running the company he would get rid of some "dead wood," and he proceeded to name five employees over the age of 50, including Pope. (Piotrowski Dep. 32-33; Pope Decl. ¶¶ 75-76.)

Piotrowski was present at the teambuilding exercise where Pope claims ageist remarks were made by Friede. (Piotrowski Decl. ¶ 18.) Piotrowski stated that when Friede asked the department to line up in order of seniority he felt "as though this was done in a manner that drew attention to the older age of a number of the members of the Department." (Piotrowski Decl. ¶ 19.) Piotrowski felt at the time of his departure that there was a bias against older workers within the PROTRA Department at Bayer in the United States. (Piotrowski Decl. ¶ 16.)

Piotrowski believes that there was an effort by Bayer to replace older PROTRA employees with younger workers. (Piotrowski Decl. ¶ 26.) Piotrowski also believed that older PROTRA employees generally received worse reviews than their younger counterparts.

The second statement was allegedly during a monthly management committee meeting, when Friede and Glenn McEvoy, another Procurement Department manager and Plaintiff's peer, both allegedly said that they wanted to replace employees with "newer, younger, fresh blood." (Pope Dep. 98-101; Piotrowski Dep. 57-58.[31]) The third allegedly ageist statement was made sometime in 2012 or 2013 by Michael Hellemann Sorenson, the Global Chief Procurement Officer, who had returned from India and made a comment about the "young," "energetic," and "enthusiastic" employees there. (Pope Dep. 105-06.) Bayer denies that these remarks were made. (Friede Dep. 98.)

Yeh recalled many meetings since July 2012 that showed the breakdown of the age demographics of the company globally in the United States. (Yeh Dep. 26-27.) Defendant responds that Yeh testified that the breakdown was not of United States' employees and further testified only about one meeting associated with announcement of a Voluntary Separation Program ("VSP") that had a bar chart with ages on it. (Yeh Dep. 26-27.) Yeh recalled a town hall meeting that showed bar charts of age demographics of Bayer employees. (Yeh Dep. 27, 59;

---

[31] Defendant cites an errata sheet on which Piotrowski wrote: "Upon further contemplation, 'younger' was not used. Glenn stated 'new hires would likely be recent graduates & they would be hired in at lower levels." However, as Plaintiff argues, the Court can refuse to consider a deponent's errata sheet that contradicts the person's prior testimony. EBC, Inc. v. Clark Bldg. Sys., Inc., 618 F.3d 253, 269-71 (3d Cir. 2010). This is especially true where the contradicted testimony is material to the issues in the case, the testimony was given in response to careful and repeated questioning, and there is no indication that the witness was confused by the questioning. Id.; see also Bartos v. Pennsylvania, 2010 WL 1657284, at *6 (M.D. Pa. Apr. 23, 2010) ("Thus, it has been said that the purpose of an errata sheet is to correct alleged inaccuracies in what the deponent said at his deposition, not to modify what the deponent said for tactical reasons or to reflect what he wishes that he had said.")

see November 20, 2013 PowerPoint presentation (Bayer-08064) (showing ages on bar graph and indicating "retirement risk age range" for employees older than 51).[32]) Yeh testified that the context of the meeting in which those slides were shown was that the slides were "a part of the presentation to talk about the voluntary separation package." (Yeh Dep. 60.)

Yeh also recalled a town hall meeting to review the VSP in which employees were asked to stand based upon experience. (Yeh Dep. 40, 58.) Yeh understood the purpose of having individuals stand based upon experience to be to show that Bayer "didn't have a lot of younger people in the company in Pittsburgh." (Yeh Dep. 41.) (suspect since he recanted on age) Defendant responds that Yeh specifically clarified his testimony, stating that "it was only based on years of experience" and that there was no request to stand based upon an employee's age. (Yeh 58.)

Voluntary Separation Program

In 2012 Bayer offered a VSP to its employees in Pittsburgh. (Badamo Dep. 222-23.) The VSP offered salary continuation for years of service by providing for two weeks of pay for every complete year of service. (Badamo Dep. 227-28.) Employees accepting the VSP had to choose a date during the approximately 18 month period from the deadline for acceptance to be their last working day. (Badamo Dep. 232.) One of the reasons the VSP was offered was workforce planning, referring to the structured separation of employment so that a significant base of employee knowledge does not "walk out the door at the same time." (Badamo Dep. 224-26.) Pope recalls there was a goal for the number of employees Bayer hoped would accept the VSP. (Pope Dep. 102; see also Piotrowski Dep. 53 (recalling that there was an "estimate" of the number of employees who Bayer thought would accept the VSP). Pope testified that Bayer fell

---

[32] ECF No. 57 Tab FF.

short of its goal of 220 Pittsburgh employees, with only 192 individuals accepting the VSP. (Pope Dep. 102.) Pope requested information on the VSP. (Pope Dep. 88-89.)

Plaintiff contends that, of the eight employees in the PROTRA department (including Pope) who requested more information on the VSP, six employees accepted the VSP and retired and two employees (one of which was Pope) did not accept despite requesting information. (Pope Dep. 88-89.) Defendant responds that Pope does not have personal knowledge of these facts. Furthermore, this was a program offered to all employees regardless of age or years of service, so it is incorrect to say that six employees "retired." In the context of discussing the VSP, Pope had asked not to be rotated out of packaging. (Pope Dep. 89-90.) Also in the context of discussing the VSP, Pope informed several of his supervisors of his intent to retire at age 55. (Pope Dep. 88-89.)

During the meeting in which Friede and McEvoy both allegedly said that they wanted to replace employees with "newer, younger, fresh blood," Friede and McEvoy specifically asked Badamo if they could get the employees who had accepted the VSP to retire sooner than the date they had chosen for their last day in order to sooner replace those employees with "newer, younger, fresh blood" employees. (Pope Dep. 98-101.)

Pope objected to the questions of Friede and McEvoy and asked that his objection be recorded in the minutes for the meeting. (Pope Dep. 101-02.) McEvoy told Piotrowski that he and Robert Kobelak (another employee who had accepted the VSP) would be replaced by younger, less experienced individuals. (Piotrowski Dep. 57-58.) McEvoy also told Piotrowski conversations he had with Friede regarding the VSP, in which McEvoy and Friede discussed employees they thought would accept the VSP and one employee they "hoped" would accept the VSP. (Piotrowski Dep. 37.)

<u>Ratings</u>

Plaintiff asserts that, during the period from 2009 through 2012, every Procurement department employee other than Pope that received an overall rating[33] of less than "fully meets" was over the age of 50. (Procurement Employee Performance Evaluations 2009-2012 (Bayer-007210-Bayer-008011) (ECF No. 47 Tab T); Chart of Procurement Department Evaluations (2009-2012) (ECF No. 47 Tab U);[34] Pope Decl. ¶¶ 74-75.)  Defendant contends that there is no evidence to support the speculation about the ages of the employees on the chart. Second, Pope was under 50 when he was rated partially meets expectations and put on a performance improvement plan. He was over 50 when his rating improved to a Meets Expectation. Third, the Chart summary fails to note the employees over age 50 who were given higher evaluations.

<u>Procedural History</u>

Plaintiff filed his complaint on March 26, 2015 (ECF No. 1).  Count I (the only count) alleges that his termination constituted age discrimination in violation of the ADEA.

On May 2, 2016, Defendant filed a motion for summary judgment (ECF No. 35). Plaintiff filed his response in opposition on July 26, 2016 (ECF No. 46) and on August 16, 2016, Defendant filed a reply brief (ECF No. 51).

<u>Standard of Review</u>

---

[33] In 2009, Bayer's performance evaluation form did not give an overall rating but separated employees' rating into two categories: business performance and leadership objectives. For purposes of the statement made in Paragraph 267, Jeff Young's 2009 evaluation (Bayer-07930), which saw him receive a "partially meets in the business performance category is included as an "overall rating of less than 'fully meets.'"

[34] Plaintiff has produced a chart listing the overall rating for Procurement department employees, as reflected in their performance evaluations, from 2009-2012. Bayer's performance evaluation form did not give an overall rating but separate employees' rating into two categories. There are only two occasions where the two categories differ for Procurement employees, and the chart notes both instances.

As amended effective December 1, 2010, the Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  Once that burden has been met, the non moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor.  Hugh v. Butler County Family YMCA, 418 F.3d 265, 266 (3d Cir. 2005); Doe v. County of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

ADEA Claims

The ADEA provides that it is an unlawful employment practice for an employer to discharge or discriminate against any individual because of such individual's age if that individual is over 40.  29 U.S.C. §§ 623(a), 631(a).  In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case of discrimination indirectly following the shifting burden analysis set forth by the Supreme Court in McDonnell Douglas v. Green, 411

U.S. 792, 802 (1973) and refined in <u>Texas Department of Community Affairs v. Burdine</u>, 450

U.S. 248, 252 53 (1981).

As the Court of Appeals for the Third Circuit has stated:

> The existence of a prima facie case of employment discrimination is a
> question of law that must be decided by the Court. It requires a showing that: (1)
> the plaintiff belongs to a protected class; (2) he/she was qualified for the position;
> (3) he/she was subject to an adverse employment action despite being qualified;
> and (4) under circumstances that raise an inference of discriminatory action...

<u>Sarullo v. U.S. Postal Serv.</u>, 352 F.3d 789, 797 (3d Cir. 2003) (footnote and citations omitted).

The Court of Appeals has indicated that, to state a prima facie case of age discrimination

in a termination case, a plaintiff must establish that he was at least 40 years of age, that he was

qualified for the position, that he suffered an adverse employment decision and that he was

replaced by a sufficiently younger person to create an inference of age discrimination. <u>Showalter</u>

<u>v. University of Pittsburgh Med. Ctr.</u>, 190 F.3d 231, 234 (3d Cir. 1999) (citation omitted).

If the employee presents a prima facie case of discrimination, the employer must

"articulate some legitimate, nondiscriminatory reason for the [adverse employment action]."

<u>McDonnell Douglas</u>, 411 U.S. at 802. If the employer specifies a reason for its action, the

employee must have an opportunity to prove the employer's reason for the adverse employment

action was a pretext for unlawful discrimination. <u>Id.</u> at 804. The Court of Appeals has stated

that:

> [T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's
> proffered legitimate reasons must allow a factfinder to reasonably infer that each
> of the employer's proffered non-discriminatory reasons was either a post hoc
> fabrication or otherwise did not actually motivate the employment action (that is,
> the proffered reason is a pretext).

<u>Fuentes v. Perskie</u>, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).

With respect to the ADEA, the Supreme Court has held that shifting the burden of

persuasion is improper because the plain language of the statute requires the plaintiff to prove that the defendant took the action "because of the plaintiff's age." Gross v. FBL Financial Servs., 557 U.S. 167 (2009). However, the Court of Appeals has held that Gross "does not forbid our adherence to precedent applying McDonnell Douglas to age discrimination cases" because McDonnell Douglas does not require shifting the burden of persuasion, but only the burden of production. Smith v. City of Allentown, 589 F.3d 684, 691 (3d Cir. 2009). Nevertheless, and unlike a case brought under Title VII, "in order to demonstrate pretext under Fuentes, it is incumbent upon the plaintiff to demonstrate that age was a determinative or 'the "but-for" cause of an employer's adverse decision;' it is not sufficient to simply show that age was 'a motivating factor.'" Hodczak v. Latrobe Specialty Steel Co., 761 F. Supp. 2d 261, 268 (W.D. Pa. 2010) (McVerry, J.) (quoting Gross, 557 U.S. at 174), aff'd mem., 451 F. App'x. 238 (3d Cir. 2011).

Defendant argues that: 1) assuming that Plaintiff states a prima facie of age discrimination, Bayer had a legitimate, non-discriminatory reason for terminating him (i.e., his frequent absences from the workplace); and 2) he fails to present evidence of pretext, either by pointing to alleged flaws in the investigation or by pointing to stray remarks from non-decision makers unrelated to the events leading to his termination.

Plaintiff argues that: 1) Defendant cannot deny that he did not violate any written rules and Bayer did not base its conclusion that he did upon reliable data; 2) Bayer's investigation was riddled with suspicious inconsistencies, contradictions and implausible claims, to the extent that the finder of fact could conclude that it was a pretext for unlawful age discrimination; and 3) the department in which Plaintiff worked maintained an ageist culture that likely motivated his termination.

40

In a reply brief, Defendant argues that: 1) Plaintiff must proffer evidence from which the trier of fact could conclude that age was the "determinative factor" in his discharge, not merely a "motivating factor," and he has failed to do so because his attack upon the investigation ignores the fact that even he cannot account for 31 work days, or over 6 weeks of unexplained absences from the workplace over a 5½ month period, which does not include three weeks of vacation and a week of sick days; 2) Plaintiff complains about the use of badge swiping to determine if he was present, but supervisors indicated that they did not rely solely on this data and that it was a good measure over a long period of time; 3) Plaintiff notes that there were no written rules regarding attendance, but there is no need for a written rule that employees are generally expected to be at work; 4) Plaintiff never notified his supervisors that he was working from home and even if he did not need permission in advance, he still was required to notify them that he was doing so; 5) even accepting Plaintiff's testimony and Piotrowski's retracted statements allegedly showing ageist bias, they were made years before the decision to terminate Plaintiff's employment by managers who had no involvement in the investigation or decision.

Defendant's Proffered Reason and Plaintiff's Evidence of Pretext

As noted, Defendant assumes for purposes of its motion for summary judgment that Plaintiff can state a prima facie case of age discrimination. (ECF No. 38 at 4.) The burden of production shifts to Defendant to point to a legitimate, non-discriminatory reason for terminating Plaintiff's employment. It describes the investigation into Plaintiff's absences from the workplace and how it concluded that, even taking into account his vacation days, sick days and days working from home, he still could not account for 31 days over a 5½ month period. Defendant has thus satisfied its relatively light burden of production. Krouse v. American Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997).

Plaintiff argues that this proffered reason is a pretext for unlawful age discrimination and proceeds along "Fuentes prong one" by arguing that he has submitted evidence from which a factfinder could reasonably disbelieve the employer's articulated legitimate reason.  Keller v. ORIX Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc).  He also proceeds along "Fuentes prong two" by arguing that Defendant's own evidence "allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action."  Keller, 130 F.3d at 1111.

Plaintiff argues that Bayer did not utilize its progressive discipline policy, but instead conducted a full-scale investigation of his absences and then fired him.  A company's failure to follow its own policy with respect to other similarly situated individuals can constitute evidence of pretext.  Fasold v. Justice, 409 F.3d 178 (3d Cir. 2005).  Nevertheless, "[i]In determining whether similarly situated nonmembers of a protected class were treated more favorably than a member of the protected class, the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action."  Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 647 (3d Cir. 1998) (citation omitted).

Plaintiff has not compared himself to any other Bayer employee who was investigated for frequent absences similar to his but was not terminated.  See Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 646 (3d Cir. 2015) (nurse practitioner admitted that there were no younger employees who used profanity or yelled at their superiors and thus she could not claim that she was treated less favorably based on her age).  He argues that Badamo did not investigate Yeh's attendance, but he points to no evidence that Badamo had reason to do so or that anyone had complained about Yeh's attendance.

The Court of Appeals has held that, to discredit the employer's proffered reason, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes, 32 F.3d at 765 (citations omitted). The Court "do[es] not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practice, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [anti-discrimination statutes do] not interfere." Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 332 (3d Cir. 1995) (citation omitted). Thus, even if Bayer was overly harsh in terminating Plaintiff's employment as opposed to imposing some lesser sanction, or if it failed to give him every benefit of the doubt, this fact would not demonstrate that it acted out of discriminatory animus.

Thus, the parties' extensive recitation of disputed facts as to whether Plaintiff actually was absent from the workplace on as many days as Bayer believes is irrelevant. Rather, the issue is whether Plaintiff has pointed to sufficient evidence from which the trier of fact could conclude that Bayer's proffered reason for his termination was a pretext for unlawful age discrimination. See Willis, 808 F.3d at 648 (plaintiff failed to proffer evidence of pretext by arguing that she did not really yell during an incident cited by the employer; the issue was whether her supervisor believed that she treated staff members inappropriately).

Plaintiff has failed to meet this burden. The facts of record (the undisputed ones and, as to the disputed ones, those construed in Plaintiff's favor as the non-moving party) demonstrate the following: 1) Bayer received an anonymous letter indicating that Pope was frequently absent from the workplace; 2) an investigation was begun, in which Badamo referred to badge swiping records, email activity and other evidence and concluded that Plaintiff was absent from the

43

workplace at least 31 days over a 5½ month period during 2013; 3) even accepting his statements as to his vacation days, sick days and days he claims to have been working from home, these 31 days remain unaccounted for; and 4) Plaintiff conceded that he was taking paid days off and not recording them in the system, as he was required to do.

Plaintiff points to what he contends are disputes in the record, such as: whether he had permission to work from home whenever he wished, whether badging records are a good measure of presence at the workplace, whether he had to enter his vacation days within a certain amount of time, whether Friede was involved in the investigation and whether Badamo approached the investigation in the manner suggested by Zervoudis or with a "guilty until proven innocent" frame of mind. As Defendant notes, most of these alleged disputes are not really disputed and, in any event, do not matter in the final analysis.

He also argues that the fact that Bayer had no written policy regarding working from home, the fact that he was meeting his job performance indicators and the fact that Zervoudis indicated at the beginning of the investigation that if he was doing his job there was no problem all call Bayer's proffered reason into question. However, he has cited no authority to support the claim that Bayer had to have a written policy regarding his working from home in order for him to have violated it, Bayer does not contend that he was failing to meet his job performance indicators, and the record is undisputed that at the conclusion of the investigation Zervoudis agreed with his colleagues that Plaintiff's employment should be terminated.

Perhaps the most significant flaw in Plaintiff's reasoning is his insistence that he did not need to report to his supervisors when he was working from home. As Defendant notes, even according to Plaintiff's own evidence, he worked at home for only 10 of the days Badamo asked him to account for, and he does not even claim that he worked at home during the 31 days at

issue. Moreover, there is no "dispute in the record" that he was required to inform his supervisors that he was working from home: Badamo and Sion testified that he was required to do so and he points only to his own testimony to contend otherwise. The criteria by which an employee is evaluated or disciplined must be set by the employer, not the employee. Simpson, 142 F.3d at 647.

Nor is the record in dispute as to whether Pope's failure to enter his vacation days into the system constituted a problem even if he did not exceed his allotted amount of vacation days for the year: Badamo testified that "recording of vacation days has an impact on the financial statements. It's required to be entered into the HR system." (Badamo Dep. 145.) In prior years, Pope entered his vacation days when he took them. But in 2013, he did not enter them until confronted with the investigation and when asked why he did not do so previously, he responded "that was lax on my part." (Pope Dep. 75-76.)

Zervoudis testified that, although badging activity might not account for Pope's presence on any one particular day, in general it is reliable. (Zervoudis Dep. 42.) See also Sion Dep. 48 (entering the building without a badge should only occur "rarely"), id. at 88 (badging activities are a reasonable measure of work attendance).

Although Badamo's testimony is unclear about whether he spoke to Friede, it is undisputed that Friede was not involved in the investigation and the decision to terminate Pope's employment. (Badamo Dep. 7; Sion Dep. 66; Zervoudis Dep. 77; Ex. P-15 (email exchanges leading to the termination, for which Friede was not a recipient.)

Plaintiff argues that the fact that Bayer had only a general rule that employees must "maintain acceptable attendance and punctuality standards as determined by the Company" means that it had no rule requiring him to be at work on a regular basis. As Bayer notes, this is a

specious argument because companies do not need written rules requiring employees to be at work on a regular basis.

Plaintiff argues that, contrary to testimony from Sion that employees did not need to be logged into Lync when working from home, Badamo appeared to be holding him to this standard. (Badamo Dep. 85.) But as Defendant points out, Badamo testified that he did not and indeed could not track Pope's Lync activity because it was not stored. (Badamo Dep. 85-86.) Thus, even if Badamo believed that Pope should have been logged into Lync when working from home, he had no way to find out if he was.

It is true that Zervoudis initially commented that if Pope was doing his job and the requirement to be in the office was not clear, he did not see a problem. (Ex. P-8.) However, he testified that, at the end of the investigation:

> we have forty-some days that we do not know where he was and, you know, we had all these issues. It [would] have been extremely difficult for me to revoke any of those arguments that I have created and stand up to management and say, yes, I do have an employee that the investigation committee came up with the result that he was not coming to work or [not] working for so many days. It [would] have been totally impossible for me to say—to save [Pope's] job.

(Zervoudis Dep. 46-47.) When the question of termination came up, Zervoudis wrote: "We do not think that we have a choice …. That's me Sion and Udesen." (Ex. P-15.)

Plaintiff has failed to meet his burden under "<u>Fuentes</u> prong one" by submitting evidence from which a factfinder could reasonably disbelieve the employer's articulated legitimate reason.

<u>Fuentes Prong Two</u>

Plaintiff also contends that he has evidence of an "ageist culture" at Bayer which supports his claim that age discrimination was the real reason for his termination. Defendant argues that the alleged ageist comments to which Plaintiff refers occurred long before and unrelated to the events leading to his discharge and were made by individuals who had no connection to the

investigation or decision to terminate his employment. The Court of Appeals has held that: "Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." Fuentes, 32 F.3d at 767 (citation omitted).

The Court of Appeals has held that:

> "When considering whether remarks are probative of discrimination, we consider the speaker's position in the organization, the content and purpose of the statement, and the "temporal connection between the statement and the challenged employment action." Ryder v. Westinghouse Elec. Corp., 128 F.3d 128, 133 (3d Cir. 1997). Here, although several of the statements were made by LSS executives, they were temporally remote from the decision to discharge Appellants, and completely unrelated to the investigation regarding Appellants' violation of the EC Policy. Thus, the comments qualify as "stray remarks" and are entitled to minimal weight. See Ezold v. Wolf, Block, Schorr & Solis–Cohen, 983 F.2d 509, 545 (3d Cir. 1992).

Hodczak v. Latrobe Specialty Steel Co., 451 F. App'x 238, 241 (3d Cir. 2011).

In this case, the remarks which Plaintiff alleges were made had no connection to his termination, were made approximately a year or more prior to his discharge and were made by individuals (Friede, McEvoy and Hellemann Sorenson) who were not involved in the investigation or the decision to terminate his employment.[35] Therefore, they represent stray remarks which are not probative of discrimination.

Plaintiff has failed to point to such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non discriminatory reasons." Fuentes, 32 F.3d at 765.

---

[35] Plaintiff strains mightily to argue that Friede was involved in the investigation and decision but, as explained above, he has failed to proffer evidence in support of this position. Ironically, Plaintiff's version of events portrays Friede as sympathetic to his case, making his contention that his termination should be linked to alleged ageist comments Friede made long before the events described herein occurred even more far-fetched.

Therefore, Defendant's motion for summary judgment will be granted.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ARTHUR POPE,                                )
        Plaintiff,                        )
                                          )
     vs.                                 )          Civil Action No. 15-422
                                          )
BAYER MATERIALSCIENCE LLC,                   )
        Defendant.                        )

ORDER

AND NOW, this 9th day of November, 2016, for the reasons provided in the

Memorandum Opinion,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment (ECF No.

35) is granted.

s/Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge